## Western Casualty & Surety Co. v. Meyer.

Feb. 1, 1946.

488

Davis, Boehl, Viser & Marcus for appellant.

Grover G. Sales, James W. Stites and Morton L. Goldsmith for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Affirming.

The appeal is from a judgment for $72,000 and interest, awarded under the rule of equitable subrogation.

A. Farnell Blair was general contractor for the con-

struction of Camp Atterbury cantonment in Indiana. He let certain sub-contracts, amounting to about $750,000, to the Meyer Plumbing & Heating Company of Louisville. It executed two bonds to Blair with the appellant, the Western Casualty & Surety Company, as surety, in the amount of $395,000. These were separate from general performance bonds. They guaranteed the principal would "promptly make payment to all persons supplying labor and material in the prosecution of the work provided for in" the contracts. The bonds were executed in Louisville on March 25, 1942.

By May 30, 1942, the Meyer Company had run out of money and then owed $34,000 to an Indianapolis company for material and supplies. It refused to furnish anything more until the debt was paid. Peter H. Meyer, Jr., was the sole owner of the stock of the Meyer Company, except a few shares qualifying his wife and another as directors. He, individually, signed the bonds also as co-principal. On June 1, 1942, his wife, Mrs. Cordelia Meyer, individually, borrowed $34,000 and turned it over to the Meyer Company, which used it to pay the debt. The Company and her husband executed their demand note to Mrs. Meyer to cover the advancement. On June 19, 1942, there was a similar transaction involving $38,000. Early in September, 1942, the Meyer Company owed some $100,000 for material and labor which it was unable to pay, and the Surety Company was compelled to take over the completion of the contract with Blair. See Western Casualty Company v. Sales, 299 Ky. 637, 185 S. W. 2d 665.

This suit is by Mrs. Cordelia Meyer against the Meyer Company, Peter H. Meyer, Jr. (since deceased) and the Surety Company to recover the $72,000. Neither the Meyer Company nor her husband (or his estate) made any defense. The plaintiff pleaded that the money had been advanced for the purpose of paying claims for labor and materials which the Surety Company had guaranteed would be paid; that by reason of that fact, "she became and is entitled to and is subrogated to all rights, title and interest and equitable liens of the said laborers and materialmen," and was entitled to recover the sum advanced. It alleged that Blair and the Surety Company well knew that the Meyer Company was unable to meet its debts; that materialmen would make no further deliveries, and that the Surety Company was con-

fronted with the obligation of taking over the contracts and had its agent in Louisville, G. Dewey Detwiler, to work out the problem. It was further pleaded that he "did encourage, advise, persuade and urge the plaintiff herein to advance the necessary funds to enable the Meyer Plumbing & Heating Company to pay for its material and to go ahead to complete the job, said Surety Company knowing that the said plaintiff would have to raise said funds through bank loans and through loans on the cash surrender value of certain insurance policies of which she was the irrevocable beneficiary, and that in compliance with said urgent advice of said Detwiler, she did raise the money in the manner aforesaid and did advance the same on the terms and conditions as is more fully set out in the original petition herein which said advancements were used as set out in said original petition as more fully explained in this amended petition, all of which was well-known to the said Surety Company."

The plaintiff also pleaded that the surety bonds were executed and the money advanced and disbursed in Kentucky.

The Surety Company made a general denial, but specifically admitted the execution of the bonds, which it alleged were to cover a contract to be performed in Indiana, and that all the money was paid to laborers and materialmen in that state. It pleaded in substance and effect that the rights of the parties were governed and were to be determined in accordance with the law of Indiana, and that the plaintiff could not recover under that law.

The indebtedness and financial distress of the Meyer Company as above outlined was admitted. The evidence on the other issues of fact is that on May 30, 1942, Meyer, his wife, Grover Sales, who was their intimate friend and attorney, and Detwiler, entered into a full discussion of the situation. According to Sales and Mrs. Meyer all agreed that the contract was a profitable one and ought to be held. Sales urged Mrs. Meyer to raise the money and advance it to the company. He was positive she would not lose anything because she would have a preferred claim as the money would be used to pay laborers and materialmen, and was also protected by the terms of the surety bond. He was so certain in his

opinion of the law in this respect that he agreed to personally sign Mrs. Meyer's note to a bank. Both he and she testified that Detwiler, the Company's agent, joined in this advice and insistence, and specifically assured her that she would be protected under the bond. He reported that in a telephone conversation with his home office he had been instructed not to take over the job "and to urge us to get as much money as we could and finish the job under our own power." Detwiler admitted all of this except as to having advised or urged Mrs. Meyer to obtain and advance the money, and as to having reported that his home office had directed him to urge Meyer to raise the necessary funds. He had no memory of having told Mrs. Meyer that she could not lose anything or that the bond of his Company would protect her, that being a legal matter of which he had no knowledge. He denied having authority to "extend the contract." He admitted, however, that his home office had instructed him not to take over the contract if it could be avoided.

The next morning the parties went over the situation with the president of the Security Bank of Louisville. Again there is some contradiction as to the part Detwiler took in the assurance given Mrs. Meyer at this time. He testified that he had remained silent. Mrs. Meyer then borrowed $34,000, with Sales as personal surety. Several days later she secured the note also by a mortgage upon her real estate. The money was immediately turned over to Meyer Company, which promptly paid the balance owing to the Indianapolis company.

During both conferences reference had been made to the pledging of the insurance policies referred to above. The president of the Security Bank was told in Detwiler's presence that more money would be needed for which the policies would be pledged as security. He suggested that the money be obtained from another bank, as Meyer was one of his directors, and he thought that it would be better to do so. Three weeks later, on June 19th, Mrs. Meyer borrowed $38,000 and pledged the insurance policies as security. This money was turned over to the company and used at once to pay supply bills of a Louisville company and an Indianapolis company, and possibly some of it to meet a payroll. Detwiler took no part in the negotiations at this bank, but was kept advised as to what was being done.

Thus, it appears that the pleading of the plaintiff was sustained by the evidence. It is only a matter of degree whether the Company's agent actively urged Mrs. Meyer to advance the money or merely acquiesced in Mr. Sales' assurances. Considered in the most favorable aspect, he was silent when he should have spoken if he had any objection.

The question, therefore, is whether one who advanced money to the principal in such a bond for the purpose of discharging claims or accounts of laborers and materialmen then due is subrogated to the rights of those paid, the advancement having been made through the partial procurement or the equivalent acquiescence of the agent of the surety, accompanied by express assurances of protection under the bond.

We first dispose of the proposition that the local agent of the Surety Company had no authority to extend or enlarge the contract. The contract was not extended or enlarged. Whatever the rights of the plaintiff be, they must come within its ambit. And since Detwiler had authority to execute the bonds, the company is chargeable with whatever knowledge he acquired as to proceedings under them and with whatever he did under them in the apparent scope of his authority.

We do not think it of controlling materiality whether the rights of these parties are to be judged under Indiana or under Kentucky law. From time immemorial it has been pointed out that, when not depending on express agreement, the principle of subrogation is a principle of equity—of compelling the ultimate discharge of an obligation by him who in good conscience ought to pay it to him who has done so for the obligor, unless he was an intermeddler or volunteer. It is closely akin to, if not a part of, the equitable principle of restitution and unjust enrichment. Restatement of the Law, Restitution, Sec. 162; 50 Am. Jur., Subrogation, Secs. 2, 21, 22; 60 C. J. 697.

Equity is the same everywhere. The traditional principles are not confined to Indiana or Kentucky. They are universal in English and American Jurisprudence. True, there are differences in the conclusions or application among the courts and even among their respective decisions. This is quite natural. The rule is flexible, being applied to do justice in each particular case. Being de-

termined by conscience, those differences probably arise in a large measure from the degrees of tenderness or toughness of the consciences of the particular courts, trained though all of them may be. We shall not presume that the conscience of the Indiana court is either less tender or more hardened than our own or that it is less responsive to the call of what is just and equitable. Indeed, we see no difference in operation upon similar states of fact; nor see what we conceive to be disloyalty to the basic principles of equity. At any rate, in this branch of the law precedents serve as guides rather than declaration, for the law of subrogation is as settled as it is universal. In the award of equitable remedies there is normally an element of great discretion. Cf. Federal Deposit Insurance Corporation v. Wilhoit, 297 Ky. 339, 180 S. W. 2d 72. We need not thread our way through the extensive labyrinth of the cases. In relation to this class, they are exhibited in Annotations, 127 A. L. R. 974, under the title, "Money loaned or advanced to contractor as within coverage of bond of building or construction contractor." See also 60 C. J. 816.

One of the factors entering into the differences of judicial opinion and upon which the decisions turn is that relating to the status of the person seeking to be subrogated with respect to his being a volunteer. His payment must not be a purely voluntary act, but must be made by or on behalf of a person who had some interest in the claim. Pomeroy's Equity Jurisprudence, Sec. 1212, 1419. Perhaps this court has been more liberal in the treatment of a claimant than some others (see 60 C. J. 807, 817; 44 Words and Phrases, Perm. Ed., Volunteer, pages 443, 449, and Pocket part), in holding that one is not a volunteer who advances the money with an express or implied agreement of either the debtor or the creditor that he shall acquire the rights which the persons paid had under a bond or other contract. This is so even though the surety or secondary obligor made no request of him or had no notice of his advancing the money. Southern Exchange Bank v. American Surety Company, 284 Ky. 251, 144 S. W. 2d 203, and cases cited. But we do not stand alone, although most of the cases of this class deal with subrogation to the rights of holders of some kind of lien. 60 C. J. 809. The plaintiff in the case at bar certainly cannot be deemed a volunteer or intermeddler under any interpretation or application

by any court. As said in 50 Am. Jur. Subrogation, Sec. 22: "One is not a volunteer within the rule here considered where he pays the debt at the instance, solicitation, or request of the person whose liability he discharges, or of that person's agent or representative."

Indeed, the evidence in the present case almost, if not altogether, establishes the right to a conventional subrogation, i. e., one arising from some understanding or agreement, express or implied. 50 Am. Jur., Subrogation, Sec. 4. The only doubt rests on the questionable authority of the agent representing the company to affirmatively bind the company. That it may be said parenthetically, is different from his knowledge of what was being done under the contract which knowledge is deemed to be that of his company. Liability is almost imposed by the doctrine of estoppel. In any event, these factors greatly fortify the plaintiff's right to an equitable or legal subrogation, for they make a strong appeal to a sense of justice.

The case is unlike many in which it is held that a bank or individual lending money to a contractor to supply him with working capital for a particular contract or job, and nothing more, is not entitled to subrogation superior to the surety even though the money was actually spent for labor or materials going into the project and which was within the coverage of the bond. 56 C. J. 506; Western Casualty Company v. Lash, 67 S. D. 139, 290 N. W. 316, 127 A. L. R. 969; Annotations, pp. 976, 989. See also Annotation, "Right as between surety on contractor's bond and assignee of money to become due on contract." 76 A. L. R. 917. The Indiana case of AEtna Trust & Savings Company v. Nackenhorst, 188 Ind. 621, 122 N. E. 421, 123 N. E. 353 (rehearing denied 188 Ind. 635, 125 N. E. 213) upon which the appellant relies as being the law by which it claims the case should be determined, is distinguishable since it comes within this class, and because the bank rested its claim upon an assignment. See dissenting opinion, 123 N. E. 353, and an expression by the court of doubt of the correctness of the decision that unpaid claims for material had no priority of claim of the bank under its equitable assignment. 125 N. E. 213. Even to this rule there have been exceptions where the surety entered into the bond with knowledge of a purpose to obtain the loan, or requested the lender to make the loan for future use.

Maryland Casualty Company v. Ballard County, 217 Ky. 343, 289 S. W. 316; Annotations, 127 A. L. R. 987. It is also unlike those cases in other jurisdictions which attach significance to the absence of notice or consent of the surety and hold there can be no legal subrogation for one who advances money for the payment of claims without notice or consent of the surety, as listed in Annotations, 127 A. L. R. 989.

We have here at hand a case where the money was advanced to the contractor for the specific purpose of paying certain obligations already incurred for labor and material—for obligations which the surety on the bonds had for practical purposes already become primarily liable, for at the time the primary obligor had defaulted. An ultimatum had been given by Blair, the general contractor, to whom the bonds had been given for protection, that the bill for materials then past due must be paid that very day or else the entire burden of paying it and of completing the job would be placed upon the surety company under its separate payment and performance bonds. In the second instance, the advancement of the $38,000 had to be made promptly, or the same condition would have been precipitated. Had this not been done in either instance, there would have been an open, accomplished breach of the contract by the Meyer Company, against which the Surety Company had indemnified the general contractor, Blair. The liability to the materialmen and laborers would have been thrown directly and immediately upon the Surety Company, which for a sufficient consideration had contracted to pay these accounts "promptly." The creditors were third party beneficiaries. When paid with Mrs. Meyer's money—not merely by and with the knowledge and consent of the obligor, the Surety Company, but with at least its tacit encouragement or assurance that she would be protected by the bonds—she became the beneficiary of the bonds in substitution of the creditors.

The appeal to the sense of natural justice, that is, for subrogation, is stronger than in Movl Construction Company v. Covington Trust & Banking Company, 258 Ky. 485, 80 S. W. 2d 560, and Southern Exchange Bank v. American Surety Company, supra, 284 Ky. 251, 144 S. W. 2d 203, in which we held that banks advancing funds to contractors to pay materialmen and laborers what was then due were entitled to subrogation to those

paid and their rights were superior to the claims of the surety on the contractors' bonds, who were claiming funds owing or paid under the construction contracts. The case comes also within the ruling in Commissioners of Sewerage of Louisville v. Gates, 159 Ky. 391, 167 S. W. 417, 420, where the contractor was unable to make payments during the progress of the work and the surety on his bond induced a third person to loan the contractor money for the job and was active in completing the arrangements for the loan, including an assignment to the lender of the retained percentages. The following extract from the opinion is pertinent here: "So it is plain that every penny of this money went into the construction work, and in that way the surety company got the benefit of it. If the loan had not been made, the surety company, under the terms of its contract, would have been compelled to pay it. It not only had notice of the security taken by Gates, but in fact induced and directed it. Whatever equities the surety company may have ever had with reference to the fund in question, these facts are certainly sufficient to be deemed a waiver on its part in favor of Gates."

The present case is also within Maryland Casualty Company v. Ballard County, supra, 217 Ky. 343, 289 S. W. 316, where the surety had expressly asked the county, for whom the project was being constructed, to loan the contractor money to enable him to go ahead with the work, and we held the surety company liable to the county for the amount of the loan.

These cases are in accord with the Restatement of the Law of Restitution, Section 162f. It is there stated: "Where one person discharges an obligation owed by another to a third person under such circumstances that he is entitled to subrogation, and the third person had a claim entitling him to preference over the claims of other creditors, he is entitled to a similar preference, except where the right of the creditor to priority was merely personal to him."

And since the appellant has contended that the Indiana law applies, we may take special notice of Massachusetts Bonding & Ins. Company v. Bankers Surety Company, 96 Ind. App. 250, 179 N. E. 329, as being in accord with our own decisions. The facts were that contractors had arranged to get money from one

Summers to finish a job of constructing a road. The particular money in the case was obtained and used for the discharge of labor and material bills then due, the payment of which had been insured by the surety on the contractors' bond. It was held that both the contractor and the surety were liable to Summers for the funds advanced by him. And in Southern Surety Company v. Merchants & Farmers Bank, 203 Ind. 173, 176 N. E. 846, 853, 179 N. E. 327, it was said in reference to the terms of a surety bond like the one here sued on that the surety would be liable to the bank "for the amount of money borrowed by the contractor, had said contractor used the money so borrowed, as he had agreed with the appellee to do, namely, to pay bills properly connected with the construction" of the roads. However, see Smiley v. State, 60 Ind. App. 507, 110 N. E. 222, drawing a distinction between one who directly paid labor claims and received assignments and one who may have loaned money to the contractor with which to pay them. See also as sustaining our conclusions, Camdenton Consolidated School District v. New York Casualty Company, 340 Mo. 1070, 104 S. W. 2d 319; Puget Sound State Bank v. Gallucci, 82 Wash. 445, 144 P. 698, Ann. Cas. 1916A, 767; Cf. Sherrill Oil Company v. Taylor, 223 Ala. 457, 137 So. 295. There are contrary decisions under variant conditions, some distinguishable easily, others not.

We concur in the opinion of the trial court that the plaintiff was subrogated to the rights of the materialmen and laborers and is entitled to maintain the action and recover from the surety on the bonds.

The judgment allows interest at the rate of 3% per annum from June 1, 1942, on $34,000, and from June 13, 1942, on $38,000, to the date of the judgment. Thereafter the judgment bears interest at 6% per annum on the principal sums. The appellant insists that the allowance of interest from the date of the advancements is erroneous because the plaintiff never sought to fasten liability on the appellant for the notes she gave for the borrowed money, and the obligation of the Surety Company, if any, was for an unliquidated claim until the judgment. In the enforcement of the equitable remedy, a court may or may not award interest according to the conception of justice and fairness. We suppose that had the various materialmen and laborers not received payment of their claims at the time, the allowance of interest

on the sums would follow as a necessary incident. The surety would have been liable for that just the same as it would for the accounts and wages had it paid the claims directly at a later date, although the bonds do not expressly provide for it. 39 C. J. 162; Mississippi Fire Insurance Company v. Evans, 153 Miss. 635, 120 So. 738. The Surety Company contracted to pay them promptly but permitted the plaintiff to do so instead. The money was then due her. Ordinarily, when money is paid for another person in satisfaction of a debt, the payment of interest is expected and collectible as compensation for the advancement. Carrs Fork Coal Company v. Johnson Drug Company, 249 Ky. 371, 60 S. W. 2d 952. In Henderson Cotton Mfg. Company v. Lowell Machine Shops, 86 Ky. 668, 7 S. W. 142, where the history of the law of interest is recited, it was held that interest was collectible on an account which, with the debtor's knowledge and without his protest, was treated by the creditor as bearing interest, the claim being a large one and running for sometime. It was regarded as a liquidated account from the time the statement was rendered and demand for payment was made. And in Commonwealth v. Kentucky Power & Light Company, 257 Ky. 66, 77 S. W. 2d 395, it is pointed out that at common law interest is due and payable at the time the principal is due in the absence of a contractual provision to the contrary. See also Helton v. Hoskins, 278 Ky. 352, 128 S. W. 2d 732.

So far as the character of the obligation of the Surety Company to the plaintiff is concerned, it was a liquidated claim from the beginning. It is not questioned that the Company is liable for the entire amount if liable for any sum. The fact that the Surety Company acted in good faith in denying its liability does not change the rule. The amount of its liability was fixed by the contract when a claim for a certain and definite sum was established. City of Louisville v. Henderson's Trustee, 11 Ky. Law Rep. 796, 13 S. W. 111; Powell v. Sparks Milling Company, 285 Ky. 727, 149 S. W. 2d 22; Siler v. Corbin Building & Supply Company, 296 Ky. 122, 176 S. W. 2d 250; Federal Deposit Insurance Corporation v. Wilhoit, 297 Ky. 339, 180 S. W. 2d 72; Tapp v. Tapp's Trustee, 299 Ky. 345, 185 S. W. 2d 534.

It is irrelevant that the plaintiff was paying interest on money she advanced during all the period. She would

have been entitled to interest in any event. But the record disclosed that Mrs. Meyer had borrowed the money at the rate of 3% and had in turn accepted the notes of the Meyer Company at the same rate. It appears that she still owes the bank all of it. The demands of equity, to say nothing of the law, justified the award of interest along with judgment for the principal.

As to the allowance of 6% interest on the judgment, the appellant invokes the benefit of the amendment to the statutes by act of 1942, now Kentucky Revised court. It did not allow interest on the accrued interest at less than the legal statutory rate of 6% (KRS 360.010) when a claim for unliquidated damages is reduced to judgment. This vests a discretion in the trial court. It did not allow interest on the accrued interest to the time as is authorized by the statute. Criswell v. Stratton & Testegge Company, 292 Ky. 219, 165 S. W. 2d 563. In the circumstances, we are not disposed to interfere with this discretionary action.

The judgment is affirmed.